902 F.2d 36
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
VAN ARNEM COMPANY, and Van Arnem Financial Services,
Plaintiff-Appellants,
v.
MANUFACTURERS HANOVER LEASING CORP. Defendant-Appellees.
 No. 89-1752.
 United States Court of Appeals, Sixth Circuit.
 May 1, 1990.
 
 Before MERRITT, Chief Judge, KRUPANSKY and MILBURN, Circuit Judges.
 MERRITT, Chief Judge.
 
 
 1
 In this breach-of-contract action based on diversity of citizenship, Van Arnem Company and Van Arnem Financial Services ("plaintiffs") appeal from the District Court's order granting defendant Manufacturers Hanover Leasing Corporation's motion for summary judgment. The contract in question concerns the tax-sheltered equipment leasing business in which a syndicator, Van Arnem, leases newly purchased equipment to businesses, then sells an interest in the leases to investors who receive certain tax advantages, such as tax credits and depreciation on the leased equipment.
 
 
 2
 The case requires us to interpret a $15 million umbrella contract providing for bank financing of a series of equipment purchases and leases contemplated by the syndicator during the nine-month life of the contract. Each individual transaction required the commercial lender, in this case defendant, to issue a separate commitment letter indicating its approval and obligating it to fund the transaction. The syndicator, in turn, was to submit, and did submit, proposals for financing individual equipment purchases and leases. Defendant issued eight commitment letters under this arrangement.
 
 
 3
 Two sets of issues arise from the umbrella contract and the commitment letters issued under it. First, whether the proposed transactions in question in this case were covered by commitment letters; and second, if not, whether defendant was obligated under the umbrella contract to issue commitment letters for the proposed transactions.
 
 
 4
 The District Court held that the transactions did not come within the commitment letters, but did not comment on or decide whether an implied covenant of good faith and fair dealing in the performance and enforcement of contracts required defendant to issue separate commitment letters for the disputed transactions. We affirm the District Court's decision that the individual transactions did not fit within existing commitment letters, but remand with instructions to conduct further proceedings on and to decide first, whether under applicable state law, be it New York or Michigan, a good-faith covenant governed the parties' business relationship; and second, if so, then whether defendant breached that covenant.
 
 Facts
 
 5
 Plaintiffs were middle-men in the equipment-leasing business. Their role was to form limited partnerships for purchase and lease of the various types of equipment that customer-lessees, whose business plaintiffs solicited, sought to acquire. A combination of commercial lending and, to a lesser extent, equity investment by the limited partners funded the purchases. As the commercial lender in this business arrangement, defendant was protected by a first-position security interest in the equipment. In addition, by assignment from plaintiffs, defendant received directly from the customers all rent payments, which were equal to the principal and interest that plaintiffs owed defendant.
 
 
 6
 In September, 1980, plaintiffs and defendant entered a $15 million umbrella contract under which plaintiffs would propose transactions requiring funding commitments from defendant. The umbrella contract fixed the interest rate at 12.75% and would expire nine months later on June 30, 1981. In exchange for the fixed interest rate, plaintiffs paid defendants $75,000, of which $50,000 was refunded as an award for submitting fundable proposals. The parties' agreement left open the identity of the customers, the kind of equipment to be purchased, and the amount of the individual loans. On February 11, 1981, plaintiffs and defendant entered a Loan and Security Agreement setting forth general conditions applicable to transactions which defendant might finance, but that document also left open the specifics applicable to individual transactions.
 
 
 7
 Individual loan commitments arose as follows. After reviewing plaintiffs' proposal for a specific transaction, defendant would issue a proposed commitment letter identifying the equipment, its manufacturer and location, the lessee, the amount of the loan, and the limited partners' required equity investment. Plaintiffs could review and negotiate the specific terms of the proposed commitment. Defendant, in turn, "reserve[d] the right to accept or reject any proposed transactions." Once plaintiffs evidenced their acceptance by signing the commitment letter, they were required to provide detailed documentation as required by the Loan and Security Agreement. Defendant then would review the documents and, if, in their view, everything was in order, fund the transaction.
 
 
 8
 Defendant funded eight transactions under the umbrella contract, for a total of just over $7 million. In June, 1981, however, as the expiration date for the 12.75% fixed interest rate neared, plaintiffs proposed five additional transactions which ultimately, for various reasons, were not funded. On December 31, 1986, plaintiffs filed their complaint in this action, alleging that defendant "breached the contract to fund [the disputed transactions,] and breached the implied covenant of good faith and fair dealings that applies to the performance and enforcement of contracts." On May 15, 1989, reasoning that defendant was under no obligation to fund the five disputed transactions, District Judge Taylor entered an order granting summary judgment in favor of defendant on Counts I (breach of contract) and II (conversion of commitment fees) of plaintiffs' complaint.[1] From that order plaintiffs now appeal.
 
 I.
 
 9
 This appeal arises out of the following five transactions:
 
 
 10
 First, in a March 9, 1981 commitment letter, defendant agreed to provide $950,000, to be distributed in one "takedown" (loan distribution), for plaintiffs' purchase of certain chemical research and development equipment for lease to Economics Laboratory, Inc. After the takedown, which provided $386,664 for the specified equipment, plaintiffs proposed an additional takedown of $582,609. This proposed takedown, when added to the only approved takedown, exceded by over $19,000 the $950,000 ceiling approved in the commitment letter. Further, it was to be collateralized by plant and manufacturing equipment rather than by chemical research and development equipment as stated in the commitment letter.
 
 
 11
 Second, in a commitment letter also dated March 9, 1981, defendant agreed to put up $1,373,550, to be distributed in one takedown, for plaintiffs' purchase of miscellaneous test equipment and minicomputers for lease to RCA Corporation. On June 25, 1981, citing improper documentation, defendant recanted its commitment to fund the transaction, then changed its mind again, committing on July 7, 1981 to reinstate the commitment. Discouraged, however, by "the dilatory tactics of defendants," RCA Corporation made other arrangements with another supplier for obtaining the equipment.
 
 
 12
 A third proposal, for which there was no commitment letter, also purporting to fund equipment for lease to RCA Corporation, called for an additional, unapproved takedown of $1.6 million, which exceeded the amount ($1,373,550) set forth in the original commitment letter.
 
 
 13
 Fourth, in another March 9, 1981 commitment letter, defendant committed to provide $2,592,110, to be distributed in "not more than five takedowns," for plaintiffs' purchase of word processing and data processing equipment for lease, on five-year terms, to Dow Chemical Company. That same commitment letter also provided that defendant would finance $4,469,500, to be distributed in "not more than five takedowns," for plaintiffs' purchase of copiers, memory typewriters, telecopiers, laboratory equipment and telecommunications equipment, for lease, on seven-year terms, also to Dow Chemical Company. After five takedowns under each type of lease, totaling $6.3 million of the $7.1 million provided for in the commitment letter, plaintiffs proposed an additional seven-year lease, this time for mobile aerial lift equipment, requiring an additional $1.6 million, which exceded by approximately $600,000 the total dollar amount approved by the commitment letter.
 
 
 14
 Fifth and finally, on April 7, 1981, defendant committed to fund plaintiffs' purchase of equipment for lease to Chemical Network Processing Services. Defendant does not dispute making that commitment; it contends instead that plaintiffs, by assigning their interest in the lease without defendant's consent, breached the nonassignment clause appearing in Sec. 2.11(c) of the Loan and Security Agreement,[2] thus excusing defendant from nonperformance under the commitment letter.
 
 II.
 
 15
 Plaintiffs have construed each commitment, limited by its terms to specific types of equipment, numbers of takedowns, and dollar amounts, to somehow obligate defendant to go forward with new proposals, for which there were no commitments, and which required different equipment, additional takedowns, and financing in excess of that permitted under the commitment letter. That is the case with the first, third, and fourth proposals mentioned above. Nothing in the record, including the assorted extrinsic evidence to which plaintiffs have referred, demonstrates the existence of a contract with regard to any of those proposals. Accordingly, the District Court's decision that those proposals were not covered by existing commitment letters is affirmed.
 
 
 16
 As for the second proposal, plaintiffs do not attempt to extend an existing commitment letter to a new proposal. Rather, they argue, the one- to two-week lapse between the withdrawl and reinstatement of defendant's commitment forced their client, RCA Corporation, to obtain the equipment from another source. In the District Court's view, the brief period that transpired between defendant's refusal to go forward and their subsequent change of heart was a temporary, nonprejudicial "failure to cooperate," not a breach. We agree.
 
 
 17
 Although it involved a proposal for which there was a commitment letter, the fifth proposal, that involving Chemical Network Processing Services, was not funded due to plaintiffs' assignment to a third party of their interest in the lease agreement. Because the assignment occurred in violation of an express condition precedent in the Loan and Security Agreement, and because there has been no evidence presented or argument advanced that would tend to show why defendants should not be entitled to determine, for their own economic protection, the identity of their assignees, the District Court's decision that the assignment relieved defendant of its contractual duty to fund the proposal is affirmed.
 
 III.
 
 18
 Our determination that the disputed transactions did not fit within existing commitment letters does not end our inquiry, however. Plaintiffs contend that Michigan law recognizes an implied covenant of good faith in the performance and enforcement of contracts. This implied covenant, they argue, obligated defendant to issue commitment letters on the proposed transactions for which no commitment letters issued. They cite several cases as authority for the proposition that such a covenant governs all contractual relations under Michigan law. See, e.g., Ferrell v. Vic Tanny Int'l, 137 Mich.App. 238, 357 N.W.2d 669 (1984); Burkhardt v. City National Bank, 57 Mich.App. 649, 226 N.W.2d 678 (1975). In response, defendant argues that the Michigan Court of appeals expressly has declined to read such a requirement into contracts. See Dahlman v. Oakland Univ., 172 Mich.App. 502, 432 N.W.2d 304 (1988).
 
 
 19
 Although plaintiffs presented this argument in their pleadings, see Plaintiffs' Complaint p 19, at 4, J.A. at 16; Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment at 9-10, J.A. at 275-76, the District Court has failed to provide this Court with a reviewable ruling. In fact, it has yet to be resolved which law--Michigan or New York--should govern the interpretation of the umbrella contract. After resolving the conflicts of law problem on remand, the District Court shall enter specific, written findings of fact and conclusions of law on the good-faith question raised both below and in this Court.
 
 IV.
 
 20
 Accordingly, the District Court's ruling that the individual transactions did not fit within existing commitment letters is affirmed. The case is remanded, however, with instructions to conduct further proceedings on and to decide whether under applicable state law, the parties were governed by an implied covenant of good faith, and if so, whether the implied covenant was breached by defendant's failure to fund the disputed transactions.
 
 
 
 [1]
 A third count (conversion of interim rents), was voluntarily dismissed under Federal Rule 41(a)(1)(ii). See Fed.R.Civ.P. 41(a)(1)(ii)
 
 
 [2]
 That section provides:
 
 
 [2]
 11 Without the prior written consent of the Lender, the Borrower will not: ... (2) sell, mortgage, transfer, assign, or hypothecate (other than to Lender hereunder or under Section 7 hereof) its interest in the Equipment or any Lease or any part thereof, or in any proceeds thereof
 On April 7, 1981, Manufacturers Hanover committed to fund the transaction, unaware that Van Arnem had assigned its interest in both the lease and the equipment to F.S. Computer Corporation, which, in turn, assigned its interest to Refco Computer Services. Each of these assignments took place without Manufacturer Hanover's consent or knowledge.